UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

ANNA ELTANIKHY-MAZZARELLA,          :

                  Plaintiff,        :

     -against-                      :      10 Civ. 6525 (RMB)(HBP)

MICHAEL J. ASTRUE,                  :      REPORT AND
Commissioner of Social Security,           RECOMMENDATION
                                    :

                  Defendant.        :
----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE RICHARD M. BERMAN, United States

District Judge,


I.   Introduction

          Plaintiff, Anna Mazzarella-Eltanikhy,[1] brings this

action pursuant to Section 205(g) of the Social Security Act

("SSA"), 42 U.S.C. § 405(g), seeking judicial review of a final

decision of the Commissioner of Social Security ("Commissioner")

denying her application for disability insurance benefits.  Both

plaintiff and the Commissioner have moved for judgment on the

_____

          [1]Plaintiff states that although the case caption lists her
name as "Anna Eltanikhy-Mazzarella," her true name is "Anna
Mazzarella-Eltanikhy" (Memorandum of Law in Support of
Plaintiff's Motion for Judgment on the Pleadings, dated February
11, 2011 ("Pl.'s Mem."), (Docket Item 7), 1 n.1).

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 7 and 9).  For the reasons set forth below, I respectfully recommend that judgment on the pleadings be granted in favor of plaintiff and the case be remanded for further proceedings consistent with this report and recommendation.

II.  Facts

    A.   Procedural Background

       Plaintiff filed an application for disability insurance benefits on March 9, 2007[2] alleging that she had been disabled since August 1, 2006 due to spinal stenosis,[3] a herniated[4] disc, a cervical spine impairment, a lumbar spine impairment, multiple

---

    [2]In a letter dated March 29, 2007, plaintiff's counsel stated that plaintiff's initial application for disability insurance benefits was filed on February 15, 2007 (see Tr. 86). However, the ALJ's decision (see Tr. 13) and the complaint state that plaintiff filed an application for benefits on March 9, 2007 (see Compl. ¶ 6).  Thus, I shall assume that the March date is the controlling date.  My assumption does not affect the outcome of this matter.

    [3]Stenosis refers to an abnormal narrowing of a duct or canal.  Dorland's Illustrated Medical Dictionary, 1795 (31st ed. 2007) ("Dorland's").

    [4]Herniated refers to something which is protruding like a hernia or enclosed in a hernia.  A hernia refers to the protrusion of a loop or knuckle of an organ or tissue through an abnormal opening.  Dorland's at 859, 862.

joint arthritis, and spondylolisthesis[5] (Tr.[6] 13, 68, 121; see also Complaint, dated September 2, 2010 ("Compl."), (Docket Item 1), ¶ 6).  The SSA initially denied plaintiff's application for benefits on May 23, 2007 (Tr. 13, 68, 72-79).  Specifically, the SSA found that while the medical evidence showed that plaintiff suffered from "pain and stiffness with some restriction of [her] activities" as a result of a back problem, plaintiff had received treatment which stabilized her condition and did not prevent her from performing her job as a technical fashion designer (Tr. 75, 79).

Plaintiff timely requested (Tr. 80-82) and was granted a hearing before an Administrative Law Judge ("ALJ") (Tr. 83-85, 89-96).  ALJ Jeffrey M. Jordan conducted a hearing on September 23, 2008 at which plaintiff was represented by Robert Snyder, Esq., an attorney advocate (Tr. 28-67).  In a decision dated January 28, 2009, the ALJ found that plaintiff had not been under a disability within the meaning of the SSA from August 1, 2006 through the date of the decision (Tr. 13-27).  The ALJ's determi-

----

[5]Spondylolisthesis refers to the forward displacement of one vertebra over another, usually of the fifth lumbar over the body of the sacrum, or of the fourth lumbar over the fifth.  Dorland's at 1779.

[6]"Tr." refers to the administrative record that the Commissioner filed as part of its answer, as required by 42 U.S.C. § 405(g).

nation became the final decision of the Commissioner on July 9, 2010, when the Appeals Council denied plaintiff's request for review (Tr. 1-6).

Plaintiff commenced the present action on September 2, 2010.  In the complaint, plaintiff alleges that she is disabled due to "major depressive disorder, anxiety disorder, [and] cervical spine and lumbar spine impairments" (Compl. ¶ 4). Plaintiff requests that "this Court modify the decision of the [Commissioner] to grant [disability insurance benefits] to the [p]laintiff during the period of disability" (Compl. at 3).  The parties now cross-move for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items 7 and 9).

The Commissioner argues that its decision was supported by substantial evidence and in accord with applicable law and regulations (Answer, dated January 3, 2011 ("Answer"), (Docket Item 5), ¶ 18; see also Memorandum of Law in Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings, dated April 8, 2011 ("Def.'s Mem."), (Docket Item 10), 1, 13-25). Plaintiff argues that (1) the ALJ violated the treating physician rule, (2) the ALJ incorrectly concluded that plaintiff's residual functional capacity ("RFC") would allow her to perform sedentary

4

work with some restrictions, and (3) the ALJ's evaluation of
plaintiff's credibility was erroneous (Memorandum of Law in
Support of Plaintiff's Motion for Judgment on the Pleadings,
dated February 11, 2011 ("Pl.'s Mem."), (Docket Item 7), 16-25).

    B.   <u>Plaintiff's Social Background</u>

       Plaintiff was born on November 4, 1972 (Tr. 25, 33, 68,
117).  At the time of the administrative hearing, she was 35
years old and lived with her husband and two daughters, who were
then seven years old and two years old (Tr. 33-34).  Plaintiff
was a college graduate, having graduated from the Fashion Insti-
tute of Technology in 1997 (Tr. 34-35), and she was last  em-
ployed as a senior technical designer at Ralph Lauren (Tr. 36-
37).  Plaintiff was terminated by Ralph Lauren on August 30, 2006
as a result of missing too many days of work due to her physical
problems; she testified that she had not worked since that time
(Tr. 36-37, 40).

       Plaintiff had been employed with Ralph Lauren for
approximately nine years, holding the title of "senior technical
designer" for about eight years and "technical designer" for
about one year (Tr. 128; <u>see</u> <u>also</u> Tr. 37-38, 122).  Other than
her job at Ralph Lauren, plaintiff's only other employment had
been a part-time retail sales associate position at a department

store and a full-time office assistant position at a law office in the early 1990s (Tr. 128; see also Tr. 38-39).

Plaintiff's primary duties as a senior technical designer at Ralph Lauren consisted of the following:[7]  (1) overseeing fittings of live models which typically lasted approximately one to two hours, (2) carrying garments -- specifically, outerwear and men's clothing -- to the live fittings, (3) engaging in constant bending and kneeling in order to adjust the garments during the live fittings, and (4) communicating with factories overseas in Italy and Asia through the use of a computer to inform them if the garments did not fit the models correctly or if there were problems with the quality of the garments (Tr. 37-38, 122).  She had technical knowledge and skills, as well as wrote, completed reports and performed similar duties[8] (Tr. 122).  She frequently lifted objects weighing less

---

[7]Because plaintiff's back problems began after she became employed by Ralph Lauren and that has been her only long-term employment, I shall limit my discussion of her typical workday to her position as a technical fashion designer.

[8]In an undated disability report, plaintiff also stated that she had used machines, tools, and equipment during her employment at Ralph Lauren (see Tr. 122).  However, in a work history report dated March 27, 2009, plaintiff stated that she did not use machines, tools, and equipment at this job (see Tr. 129-31).  Because the work history report is in plaintiff's handwriting, and the undated disability report appears to be comprised of computer entries entered by a SSA representative, I treat the work history report as controlling.

than ten pounds, with the maximum weight lifted being fifteen pounds[9] (Tr. 123, 129; see also Tr. 37).  In her typical workday, plaintiff spent (1) a half-hour walking, climbing, kneeling, and handling, grabbing, or grasping big objects, respectively, (2) a half-hour to one hour crouching, (3) two hours standing and stooping, respectively, and (4) three hours sitting and writing, typing, or handling small objects, respectively.[10]  She did not spend any part of her workday crawling (Tr. 129).  As a technical designer at Ralph Lauren, her primary duties and typical workday were virtually the same as discussed above, with the only differ- ence being that the maximum weight she lifted was ten pounds (see Tr. 130-31).

---

[9]Again, plaintiff stated in the undated disability report that the maximum weight lifted during her employment at Ralph Lauren was thirty pounds (see Tr. 122), though her handwritten work history report states that the maximum weight lifted was fifteen pounds (see Tr. 129).  As explained in footnote 8, I treat the work history report as controlling.

[10]Again, the breakdown of plaintiff's workday differs slightly in the undated disability report as compared to the work history report.  The tasks listed in the text reflect the information in the work history report (see Tr. 129).  In the undated disability report, plaintiff stated that she spent:  (1) two hours per day walking, standing, and handling, grabbing, or grasping big objects, respectively, (2) three hours per day stooping, kneeling, and crouching, respectively, (3) four hours per day reaching and writing, typing, or handling small objects, respectively, and (4) six hours per day sitting (Tr. 122; see also Tr. 37-38).  She also stated that she did not spend any part of her workday climbing or crawling (Tr. 122).

C.   <u>Plaintiff's Medical Background</u>

    1.   <u>Information Reported by Plaintiff</u>[11]

Plaintiff reported that she could not lift, bend, stand, sit or walk for an extended period of time. Plaintiff also stated that her condition caused her pain and other symptoms. Specifically, plaintiff alleges that her condition began to interfere with her ability to work, and thereby rendered her unable to work, on August 1, 2006 (Tr. 121). Plaintiff also reported that though she could care for her personal needs, she could only do so "at a slower rate of time" (Tr. 144).

    2.   <u>Treatment Records</u>

A magnetic resonance imaging ("MRI") scan was taken of plaintiff's cervical spine on March 8, 2006. This scan revealed that there was a "congenitally short AP diameter of the C4 and C5 segments," but that there were "no bulging or herniated cervical discs" (Tr. 186, 256, 353). Following the MRI scan, the treat-

---

[11]Plaintiff testified in detail about her condition and activities of daily living at the administrative hearing before ALJ Jordan on September 23, 2008. That testimony is summarized in the following section entitled "Proceedings Before the ALJ."

ment records in the administrative record span from late August
2006 through mid-August 2009.

> a.   Long Island City
>      Pain Management &
>      Rehabilitation Offices, P.C.

From late 2006 through early 2009, plaintiff was
primarily treated by physicians from the Long Island City Pain
Management & Rehabilitation Offices, P.C. ("LICPMR").  These
physicians included:  (1) Dr. Igor Cohen, (2) Dr. Andrew Dowd,
(3) Dr. David Zelefsky, and (4) Dr. Paolo Perrone.  I shall
discuss their findings in chronological order.

Plaintiff was first examined by Dr. Cohen, a neurolo-
gist, on August 29, 2006 (Tr. 167-71, 203-07, 271-75, 339-43).
At this time, plaintiff complained of lower back pain, neck pain,
and mid-back pain.  Plaintiff reported that she had been experi-
encing this pain "for many years" on an intermittent basis;
however, her lower back pain had become constant and
"fluctuat[ed] from moderate to moderately severe."  Plaintiff
rated her lower back pain "as [a] 5-8/10" and stated that it
"radiat[ed] to [her] upper mid-back and intermittently to [her]
left lower extremity."  Plaintiff also noted that her lower back
pain was "aggravated by any physical activities, prolonged
sitting and lying down."  With respect to her neck and mid-back

pain, plaintiff stated that the pain was "intermittent, mild-to-moderate, graded as 3-6/10 and mostly localized."  Dr. Cohen noted that plaintiff was not taking any medication because she was a "nursing mother" (Tr. 167, 203, 271, 339).

After conducting a physical examination of plaintiff, Dr. Cohen noted that there was a "moderate tenderness in [plaintiff's] cervical and thoracic[12] paraspinal muscles" and a "moderately severe tenderness in the lumbosacral[13] paraspinal muscles bilaterally" (Tr. 168, 204, 272, 340).  Further, plaintiff's range of motion was "somewhat restricted" and "accompanied by end point pain" in her cervical spine, thoracic spine, and lumbar spine (Tr. 168-69, 204-05, 272-73, 340-41).  After conducting a neurological examination of plaintiff, Dr. Cohen noted that she was "alert, awake and oriented" and that her cognitive function was "intact."  Straight leg raising was "positive bilaterally." (Tr. 169, 205, 273, 341).  Plaintiff's sensation was "normal to light touch and pinprick, except for hypoesthesia[14] in the left

---

[12]Thoracic pertains to the thorax (chest).  Thoracispinal pertains to the thoracic portion of the spinal column.  <u>Dorland's</u> at 1945.

[13]Lumbosacral pertains to the loins and sacrum.  <u>Dorland's</u> at 1092.

[14]Hypoesthesia refers to a dysesthesia consisting of abnormally decreased sensitivity, particularly to touch. Dysesthesia refers to the distortion of any sense, especially
(continued...)

C8 dermatome[15] and hypoesthesia in the left L5 dermatome."  Her gait was "minimally antalgic[16] to the left."

Based upon this examination, Dr. Cohen's overall impression of plaintiff was that she had "[a] history, symptoms, and findings consistent with lower back pain exacerbation, lower back syndrome, cervicobrachial[17] syndrome, thoracic pain, cervical and lumbosacral nerve root injury and cervical and lumbar myofascitis[18]" (Tr. 170, 206, 274, 342).  Dr. Cohen recommended that plaintiff:  (1) undergo further testing of her cervical and lumbar spine, including x-rays, MRI scans, and computerized muscle and range of motion testing, (2) undergo a nerve conduction study of her upper and lower extremities, (3) begin physical

----

[14](...continued)
that of touch.  Dorland's at 584, 914.

[15]Dermatome refers to the area of skin supplied with afferent nerve fibers by a single posterior spinal root. Dorland's at 504.

[16]Antalgic refers to the counteraction or avoidance of pain, such as a posture or gait assumed so as to lessen pain. Dorland's at 98.

[17]Cervicobrachial pertains to the neck and upper limb. Dorland's at 339.

[18]Myofascitis refers to the inflammation of a muscle and its fascia, particularly the fascial insertion of muscle to bone. Fascia refers to a sheet or band of fibrous tissue such as lies deep to the skin or forms an investment for muscles and various other organs of the body.  Dorland's at 1241.

therapy, and (4) undergo an evaluation by a chiropractor (Tr. 170-71, 206-07, 274-75, 342-43).

On September 5, 2006, an MRI scan was taken of plaintiff's lumbrosacral spine.  This scan revealed a "[s]ubligamentous posterior disc herniation at L5-S1 impinging on the anterior aspect of the spinal canal and on the neural foramina[19] bilaterally" and "Grade II spondylolisthesis at LS-51" (Tr. 187, 208, 255, 344).

On September 8, 2006, plaintiff began to undergo physical therapy.  The administrative record shows that plaintiff continued attending physical therapy sessions through November 2, 2007, until her insurance would no longer cover the sessions (see Tr. 46, 209-27, 372-401).  At her first session, plaintiff complained of pain in her cervical spine, mid-back, and lower back, with the lower back pain radiating to her lower left extremity.  On a scale of one to ten, plaintiff rated the pain and discomfort in her neck as a seven, in her mid-back as a three, and in her lower back as a seven.  After conducting a physical examination of plaintiff, her physical therapist noted "a medium level of tenderness" and "moderate trigger points" in plaintiff's neck, as well as "[s]light pain and discomfort at T9

_____

[19]Foramina refers to natural openings or passages, especially one into or through a bone.  Dorland's at 737, 740.

12

on the left and T4-T8 bilaterally" and "a moderate level of pain
and discomfort at C5-C8 and T13-T14 bilaterally" (Tr. 209, 372).
There was also hypertonicity[20] in plaintiff's thoracic muscles as
well as a moderate tension in her cervical paraspinal muscles and
lower thoracic muscles (Tr. 209-10, 372-73).  Plaintiff's physi-
cal therapist opined that plaintiff had "entered a chronic stage"
in her condition[21] (Tr. 210, 373).

Plaintiff underwent a nerve conduction study to rule
out cervical radiculopathy[22] on September 11, 2006 (Tr. 172-74,
268-70, 325-27) and underwent a second nerve conduction study to
rule out lumbosacral radiculopathy on September 20, 2006 (Tr.
175-178, 264-67, 328-31).  These studies revealed no evidence of
either condition (Tr. 174, 178, 267, 270, 327, 331).

---

[20]Hypertonicity refers to excessive tone of the skeletal
muscles, so that the muscles have increased resistance to passive
stretching and the reflexes are often exaggerated; this usually
indicates upper motor neuron injury.  Dorland's at 910.

[21]The remainder of plaintiff's physical therapy sessions
show that while she reported experiencing slight relief
intermittently throughout her treatment, her reported pain levels
remained substantially unchanged.  Additionally, the remainder of
the sessions show that, at times, plaintiff's condition was
characterized as "chronic," though it was primarily characterized
as "well-controlled."  Plaintiff was also generally noted to have
"good to fair" endurance, tolerance, and understanding of tasks
(see Tr. 372-401; see also Tr. 209-227).

[22]Radiculopathy refers to a disease of the nerve roots.
Dorland's at 1595.

On September 29, 2006 and October 11, 2006, plaintiff underwent computerized muscle and range of motion testing (Tr. 188-98, 228-38, 244-56, 354-64).  The September 2006 test yielded the following results:  (1) a 15% right lower extremity impairment, and (2) a 15% final whole person impairment (Tr. 195, 238, 254, 361).[23]  The October 2006 test yielded the following results:  (1) a 4% spine impairment, and (2) a 4% final whole person impairment (Tr. 198, 230, 246, 364).

Plaintiff was first examined by Dr. Dowd, an orthopedic surgeon, on December 7, 2006 (Tr. 199-200, 239-40, 242-43, 365-66).  After conducting a physical examination of plaintiff, he noted that:  (1) plaintiff's range of motion was "restricted and painful" in both her cervical and lumbar spine, (2) there was "tenderness and spasm" in the paraspinal muscles of both plaintiff's cervical and lumbar spine, (3) plaintiff's "upper extremity motor power and sensation [were] intact," and (4) there was a "[w]eakness of [plaintiff's] lumbosacral extension," but "[her] [l]ower extremity sensation was intact."  Straight leg raising had become bilaterally negative.  Based upon this examination, Dr. Dowd opined that plaintiff had a cervical sprain and a lumbar

_____

[23]With respect to the results of a computerized muscle test, "[w]hen compared to the opposite side, greater than 15% strength difference is generally recognized as an indication of motor deficit" (Tr. 188, 196, 228, 231, 244, 247, 354, 362).

14

sprain with spondylolisthesis (Tr. 199, 239, 242, 365). Dr. Dowd recommended that plaintiff "[b]egin anti-inflammatory medication upon completion of breast feeding" (Tr. 200, 240, 243, 366).

Plaintiff was first examined by Dr. Zelefsky, a board certified physician in Physical Medicine and Rehabilitation, on December 11, 2006 (Tr. 179-82, 260-63, 345-48). Dr. Zelefsky, noted that plaintiff was still not taking any medication other than an occasional Tylenol because she was nursing. Dr. Zelefsky also noted that plaintiff complained of neck pain with radiating symptoms to her left shoulder, localized mid-neck pain, and lower back pain which radiated to her left leg (Tr. 179, 260, 345). After conducting a physical examination of plaintiff, Dr. Zelefsky observed that plaintiff had a "mild range of motion loss" and "cervical paraspinal tenderness" in her cervical spine. In her thoracic and lumbar spine, plaintiff had a "moderate range of motion loss" and "paraspinal tenderness and spasm." Straight leg raising was positive on the right (Tr. 180, 261, 346).

After conducting a neurological examination of plain-tiff, Dr. Zelefsky noted that plaintiff was "awake, alert and oriented." Muscle testing showed that plaintiff's muscle strength was generally within normal limits, i.e., 5/5, with the exception of reductions to either 4/5 or 4+/5 in her deltoid muscle (C5), biceps (C5, CS), and hamstrings on both the left and

right sides (Tr. 180-81, 261-62, 346-47).  Additionally, plain-
tiff's deep tendon[24] reflexes were 1+ -- instead of 2+, the norm
-- except in her Achilles tendon, of which a measurement had not
been obtained.  Plaintiff's sensation was "intact" for both her
upper and lower extremities and her gait[25] was "normal."  Based
upon this examination, Dr. Zelefsky opined that plaintiff "ha[d]
signs of cervical radiculopathy, lumbosacral radiculopathy,
cervical, thoracic and lumbosacral myofascitis and [a] herniated
disc at L5-S1" (Tr. 181, 262, 347).

        On December 14, 2006, plaintiff was examined by Dr.
James Hughes, a neurological surgeon, who conducted an independ-
ent medical examination at the request of plaintiff's insurance
carrier (Tr. 278-82).  After examining plaintiff, Dr. Hughes
noted that her gait was "normal."  Plaintiff was also "able to
walk on her heels and toes" and she "could step up on a low stool
with either foot."  However, there was a "pronounced stepoff of
L5 forward on S1" and a "moderate spasm of the lumbar muscles on
the left side" in her lumbar spine.  Her lumbar flexion[26] was

_____

        [24]Tendon refers to a fibrous cord of connective tissue by
which a muscle is attached.  Dorland's at 1904.

        [25]Gait refers to a manner or style of walking.  Dorland's at
764.

        [26]Flexion refers to the act of bending or condition of being
bent.  Dorland's at 725.

16

also limited to "40 degrees bending at her hips."  Plaintiff's straight leg raising was "limited at 70 degrees by low back pain on the right side and at 30 degrees on the left side by leg pain."  Thus, Dr. Hughes opined that plaintiff had "L5-S1 spondylolisthesis, grade II, with left-sided radiculopathy" (Tr. 280).

Dr. Hughes further characterized plaintiff's condition as a "moderate disability" and stated that she should "avoid anything that produces back and leg pain" (Tr. 281).  With respect to plaintiff's ability to work, Dr. Hughes opined that she was disabled for her job at Ralph Lauren and only surgical intervention would allow her to return to work full-time.  Notwithstanding these limitations, however, Dr. Hughes also opined that plaintiff could work an eight-hour workday with certain limitations on bending, stooping, sitting, and handling objects (Tr. 281).

Dr. Zelefsky examined plaintiff again on January 29, 2007 (Tr. 183-85, 257-59, 349-50) and April 16, 2007 (Tr. 332-35; see also Tr. 290), and completed a Spinal Impairment Question- naire on April 4, 2007 (Tr. 303-09).  Dr. Zelefsky's findings in late January 2007 were substantially similar to his findings in early December 2006, with the exception of the following:  (1) in January 2007, Dr. Zelefsky described plaintiff's range of motion

in her cervical, thoracic, and lumbar spine as "restricted," and (2) in January 2007, plaintiff's muscle strength had slightly worsened to 4/5 in her biceps on both the left and right sides (compare Tr. 183-85, 257-59, 349-50 with Tr. 179-82, 260-63, 345-48). Most importantly, his diagnosis of radiculopathy, myofascitis, and a herniated disc remained the same.

On April 4, 2007, Dr. Zelefsky opined on plaintiff's ability to work (see Tr. 303-09). Specifically, with respect to an eight-hour workday, Dr. Zelefsky opined that plaintiff (1) could not sit more than four hours a day, (2) could not stand or walk more than two hours a day, (3) would have to move from either a standing, walking, or sitting position approximately every thirty minutes for about five minutes before returning to the respective position, (4) could only lift or carry objects ranging from zero to twenty pounds occasionally, (5) would need to take unscheduled breaks throughout the workday, and (6) would likely miss more than three days of work a month. Plaintiff also had a variety of other work limitations including, among other things, the inability to push, pull, kneel, bend, or stoop. Dr. Zelefsky also stated that plaintiff's pain and other symptoms would interfere with her attention and concentration constantly and that plaintiff was incapable of handling even a low stress work environment (Tr. 306-09).

On April 16, 2007, plaintiff went to Dr. Zelefsky for a
follow-up visit (Tr. 332-35; see also Tr. 290).  During this
visit, plaintiff reported that her neck and mid-back pain were
"not as severe" as before; however, her lower back pain was still
problematic.  On a scale of zero to ten, she rated her neck pain
as a three, her mid-back pain as a five, and her lower back pain
as a seven.  Plaintiff also complained of left knee pain and
"clicking of the knee."  Dr. Zelefsky noted that plaintiff was
still nursing, and thus, was not taking any medication for her
condition.

With respect to plaintiff's physical condition, Dr.
Zelefsky's findings were substantially similar to his findings in
late January 2007 (compare Tr. 332-35; see also Tr. 290 with Tr.
183-85, 257-59, 349-50).  Straight leg raising, however, was
positive on the left side this time (Tr. 332-33).  Additionally,
plaintiff suffered from left knee "pain with end flexion," "joint
line tenderness;" and "tenderness along the patellar[27] tendon"
(Tr. 333).  With respect to plaintiff's neurological examination

_____

[27]Patellar pertains to the patella and the femur.  The
patella is a triangular sesamoid bone, about 5 cm in diameter,
situated at the front of the knee in the tend of insertion of the
quadriceps extensor demoris muscle (also known as the kneecap).
The femur is the bone that extends from the pelvis to the knee,
and along with the patella and tibia, forms the knee joint.
Dorland's at 696, 1415.

results, Dr. Zelefsky's findings were also substantially the same as his findings in late January 2007.  Plaintiff's muscle strength in her biceps, however, had improved to a 5/5 on both the left and right sides.  Additionally, her muscle strength in her quadriceps had slightly worsened to 4+/5 on the left side (Tr. 333-34).  On the basis of this examination, Dr. Zelefsky's diagnosis remained the same, except that plaintiff additionally had "left knee derangement[28]" (Tr. 334).

On May 7, 2007, an MRI scan was conducted of plaintiff's left knee (Tr. 351-52, 409-10, 416-17).  This scan revealed a "2.5 x 1.8 x 2.3 cm well circumscribed mass in the anterior aspect of the knee in keeping with nodular pigmented villonodular synovitis[29] (PVNS)."  Surgery was recommended (Tr. 352, 410, 417).

On May 31, 2007, a few days after plaintiff had been admitted to the Mount Sinai Hospital of Queens ("Mount Sinai")

---

[28]Derangement refers to the disarrangement of a part or organ.  Dorland's at 500.

[29]Pigmented villonodular synovitis refers to synovial proliferation forming brown nodular masses, probably caused by some trauma to the synovial membrane, resulting in synovial hyperplasia and inflammation.  The condition is characterized by episodic monoarticular pain and swelling, with joint locking and hemorrhagic effusions.  Hyperplasia refers to an abnormal multiplication or an increase in the number of normal cells in the normal arrangement in a tissue.  Hemorrhagic pertains to a hemorrhage, which in turn, refers to the escape of blood from the vessels.  Dorland's at 853, 906, 1879.

for severe neck pain,[30] plaintiff was examined by Dr. Zelefsky
again (Tr. 336-38).  Dr. Zelefsky noted plaintiff's visit to
Mount Sinai and then reported that she had rated her neck pain as
a seven, her mid-back pain as a five, her lower back pain as a
seven, and her left knee pain as a four.  After conducting
physical and neurological examinations of plaintiff, Dr.
Zelefsky's findings were substantially the same as his findings
in mid-April 2007 (compare Tr. 336-38 with Tr. 332-35, see also
Tr. 290).  However, plaintiff's range of motion had worsened in
her cervical and thoracic spine to "moderate restrictions" and
"marked restrictions," respectively (Tr. 336).  Additionally,
while plaintiff's muscle strength otherwise remained the same,
her muscle strength in her biceps had worsened to 4/5 on both the
left and right sides and had worsened to 4/5 in her quadriceps on
the left side.  Finally, plaintiff's deep tendon reflexes had
improved to 2+ (Tr. 338).

        On June 18, 2007, a MRI scan was conducted of plain-
tiff's cervical spine.  This scan revealed "a moderate central

_____

        [30]The treatment records from Mount Sinai will be discussed
in the following subsection entitled "Mount Sinai Hospital of
Queens."

disc protrusion indenting the thecal sac[31] [at C4-C5] [with] no neural foraminal narrowing" (Tr. 371).

Following this MRI scan, plaintiff was examined by Dr. Zelefsky on July 25, 2007 (Tr. 367-70).  Dr. Zelefsky noted that plaintiff had another "flare-up of her neck pain," as well as continued to experience intermittent mid-back and left knee pain and constant lower back pain which radiated to her left leg.  He also noted that she was still not taking any medications and that the issue of medication would be revisited once she finished nursing (Tr. 367).

With respect to plaintiff's physical and neurological examinations, Dr. Zelefsky's findings were substantially the same as his findings in late May 2007 (compare Tr. 367-70 with Tr. 336-38).  Plaintiff's range of motion, however, had improved to "moderate restrictions" in her thoracic spine and to "mild-to-moderate restrictions" in her lumbar spine (Tr. 367-68).  Additionally, straight leg raising was negative (Tr. 368).  Plaintiff's muscle strength improved slightly in all areas -- specifically, to 5/5 in her deltoid muscle (C5), biceps (C5, C6), and hamstrings on the right side (Tr. 368-69).  However, plaintiff's

----

[31]Thecal pertains to a theca, which in turn, refers to an enclosing case or sheath, as of an ovarian follicle or tendon. Sac refers to a pouch or a bag.  Dorland's at 1685, 1933.

deep tendon reflexes had worsened again to 1+ in all tendons but
the Achilles tendon, of which a measurement had not been ob-
tained.  On the basis of this examination, Dr. Zelefsky's diagno-
sis remained the same as previous examinations, except that
plaintiff additionally had "pigmented villonodular synovitis of
the left knee" and a "C4-5 central disc protrusion" (Tr. 369).
Dr. Zelefsky recommended that plaintiff continue with physical
therapy and that she undergo an orthopedic consultation of her
left knee as well as other testing (Tr. 370).

On August 20, 2007, plaintiff underwent a nuclear bone
scan, which revealed normal findings (Tr. 412, 419).

Plaintiff was first examined by Dr. Perrone, an inter-
nist, on October 22, 2007 (Tr. 311-15).  Dr. Perrone noted that
plaintiff continued to complain of neck pain, mid-back pain,
lower back pain, and left knee pain which radiated to her upper
and lower extremities.  Dr. Perrone also noted that plaintiff was
still not taking any medications (Tr. 311).  With respect to
plaintiff's cervical, thoracic, and lumbar spine, Dr. Perrone
noted a "limited range of motion with end point pain," and
further, that straight leg raising was positive bilaterally.
There was also "paraspinal spasm and tenderness" in plaintiff's
cervical and thoracic spine, as well as "paraspinal spasm and
tenderness with trigger points" in plaintiff's lumbar spine (Tr.

23

312-13).  With respect to plaintiff's left knee, Dr. Perrone
noted "tenderness at the medial and lateral joint lines," but
that there was "full range of motion with end point pain" (Tr.
313).  As compared to plaintiff's July 2007 examination by Dr.
Zelefsky, plaintiff's muscle strength had improved to either 5-/5
or 5/5 in all areas in which it had been lacking, though it had
slightly worsened in her quadriceps to 5/-5 (<u>compare</u> Tr. 311-15
<u>with</u> Tr. 367-70).  Plaintiff's deep tendon reflexes had also
improved to 2+, including her Achilles tendon, of which a mea-
surement had been obtained (<u>compare</u> Tr. 367-70 <u>with</u> Tr. 311-15).
There were no changes in plaintiff's gait, which was still
normal, nor any changes in her sensation, which was still intact
(Tr. 315).

        Plaintiff was next examined by Dr. Zelefsky on January
2, 2008 (Tr. 429-32).  Dr. Zelefsky noted that plaintiff had been
given a prescription for Celebrex, though she had not yet started
taking the medication.  Additionally, Dr. Zelefsky noted that
plaintiff was speaking to an orthopedist about possible surgery
to her left knee.  Plaintiff's physical and neurological examina-
tions yielded similar results to her prior examinations.  With
respect to plaintiff's muscle strength, however, it had worsened
again to 4/5 in plaintiff's biceps, quadriceps, and hamstrings on
the left side.  Plaintiff's deep tendon reflexes had also wors-

ened to 1+ in all tendons but her Achilles tendon, a measurement of which had not been obtained (Tr. 431).  Based upon this examination, Dr. Zelefsky recommended further x-rays and an orthopedic follow-up, as well as requested that plaintiff's insurance carrier authorize physical therapy again for which plaintiff had been denied coverage since early November 2007 (Tr. 432, see also Tr. 46).

On January 14, 2008, plaintiff underwent x-rays of her cervical, thoracic, and lumbar spine (Tr. 433-35).  These x-rays revealed that:  (1) in plaintiff's cervical spine, there were "[b]lock vertebra at C4-C5 likely on a congenital[32] basis," (2) in plaintiff's thoracic spine, there were no positive findings, and (3) in plaintiff's lumbosacral spine, there was "spondylolysis[33] of L5 with a significant spondylolisthesis of L5 on S1" and that "discogenic disease" was likely (Tr. 433, 435).  Plaintiff also underwent an x-ray of her left knee, which re-vealed "lateral tilt/subluxation[34] of the patella" (Tr. 433, 435).

---

[32]Congenital refers to conditions that are present at birth. Dorland's at 410.

[33]Spondylolysis refers to degenerative spinal changes due to osteoarthritis.  Dorland's at 1780.

[34]Subluxation refers to an incomplete or partial dislocation.  Dorland's at 1817.

On January 25, 2008, plaintiff was examined by Dr. Walter Besser, an orthopedic surgeon, for her left knee[35] (Tr. 422-26). While Dr. Besser's report is difficult to read because it is handwritten, it appears to confirm that plaintiff was experiencing issues with her left knee (see Tr. 425). This conclusion is confirmed by the fact that Dr. Besser prescribed Celebrex and conducted an aspiration[36] of plaintiff's left knee (see Tr. 423-24). The aspiration revealed the following: (1) the "Gram Stain"[37] showed "few white blood cells," but "no organ

---

[35]The administrative record indicates that plaintiff saw Dr. Besser again on April 29, 2008 (see Tr. 442). However, the medical evidence in the record contains no report from Dr. Besser on this date. Further, the administrative record includes a letter from plaintiff's counsel dated August 26, 2008, which indicates that it was submitting medical records from Dr. Besser dated 05/27/2007 through 01/17/2008 (see Tr. 408). It is unclear, however, whether the records that follow this letter are from Dr. Besser (see Tr. 409-14). Those records include: (1) a MRI scan of plaintiff's left knee taken on May 7, 2007 and a nuclear bone scan taken on August 20, 2007 by Advanced Radiological Imaging addressed to Dr. Zelefsky and Dr. Theodore Giannaris, respectively (see Tr. 409-10, 412), and (2) handwritten notes that do not bear a name (see Tr. 411, 413-14).

[36]Aspiration refers to removal by suction of excess fluid or gas from a body cavity or of a specimen for biopsy. Dorland's at 167.

[37]"Gram Stain" refers to an empirical staining procedure in which microorganisms are stained with crystal violet, treated with 1:15 dilution of strong iodine solution, decolorized with ethanol or ethanol-acetone, and counterstained with a contrasting dye, usually safranin O. Those microorganisms that retain the crystal violet stain are said to be gram-positive, and those that
(continued...)

isms," and (2) the "Culture Other" analysis showed "no growth" (Tr. 426).

Following the x-rays and orthopedic consultation, Dr. Zelefsky examined plaintiff on February 11, 2008 (Tr. 404-07) and on April 16, 2008 (Tr. 438-41).  These examinations yielded substantially similar findings.  Dr. Zelefsky noted that plaintiff continued to experience pain in her neck, mid-back, lower back, and left knee, and further, that she was taking Celebrex (Tr. 404, 438).  Both of plaintiff's physical examinations continued to show "paraspinal tenderness and spasm" in her cervical, thoracic, and lumber spine.  With respect to plaintiff's range of motion, she experienced (1) "mild restrictions" in her cervical spine in February 2008 and "moderate restrictions" in April 2008, (2) "moderate restrictions" in her thoracic spine in both February 2008 and April 2008, and (3) "mild-to-moderate restrictions" in her lumbar spine in both February 2008 and April 2008 (Tr. 404-05, 438-39).  There was still "joint line tenderness" in her left knee.  Straight leg raising was negative (Tr. 405, 439).  Plaintiff's muscle strength and deep tendon reflexes remained unchanged from her January 2008 examination,

---

[37](...continued)
lose the crystal violet stain by decolorization but stain with the counterstain are said to be gram-negative.  Dorland's at 812, 1787.

except that (1) plaintiff's muscle strength in her quadriceps had improved to 5/5 on the left side in February 2008 and had worsened to 4/5 on the left side in April 2008, and (2) plaintiff's deep tendon reflexes in her hamstrings and patellar had improved to 2+ in February 2008, but slightly worsened to 1+ in April 2008 (Compare Tr. 405-06, 439-40 with Tr. 429-32).  Dr. Zelefsky continued to recommend authorization from plaintiff's insurance company for physical therapy (Tr. 407, 441).

On May 12, 2008, plaintiff was referred by Dr. Perrone to a psychiatrist for depression and anxiety (Tr. 465).  On July 21, 2008, plaintiff was examined by Dr. Thein Han (Tr. 445-46).  After conducting an examination of plaintiff, Dr. Han noted that: (1) plaintiff's affect was depressed and sad, (2) plaintiff's speech was normal, and (3) plaintiff's thought content was without delusions (Tr. 445).  Dr. Han diagnosed plaintiff with major depression and generalized anxiety disorder and recommended therapy.  She also prescribed Cymbalta and Effexor (Tr. 446; see also Tr. 45).

Plaintiff was examined by Dr. Zelefsky again on the following dates:  July 28, 2008 (Tr. 466-69); October 29, 2008 (Tr. 470-73); January 12, 2009 (Tr. 474-77, 483-87); and March

28

16, 2009[38] (Tr. 479-83).  These examinations all yielded substan-
tially similar findings.  Dr. Zelefsky noted plaintiff experi-
enced "moderate restrictions" and "paraspinal tenderness and
spasm" in her cervical, thoracic, and lumbar spine (Tr. 466, 470,
474-75, 479-80, 483-84).  Straight leg raising was negative.
There was still "joint line tenderness" in plaintiff's left knee,
but a full range of motion, except for pain with end flexion (Tr.
467, 471, 475, 480, 484).  Plaintiff's muscle strength remained
unchanged from her April 2008 examination, with the exception of
her deltoid muscle slightly worsening to 4/5 on the left side in
March 2009 (compare Tr. 439-40 with Tr. 467-68, 471-72, 475-76,
481-82, 484-85).  Plaintiff's deep tendon reflexes also remained
unchanged, with the exception of improvement to 2+ in March 2009.
Dr. Zelefsky continued to recommend authorization from plain-
tiff's insurance company for physical therapy (Tr. 468, 472, 476,
482, 486).

---

[38]The March 2009 examination occurred after the ALJ had
issued his decision on plaintiff's appeal.  However, because Dr.
Zelefsky's findings were largely the same as his findings from
examinations conducted prior to the ALJ's decision, I discuss
them together.

b.   The Mount Sinai
     Hospital of Queens

Plaintiff visited the emergency room of Mount Sinai in late May 2007 (Tr. 301-02, 448-52).  The records from Mount Sinai dated May 26, 2007 show that plaintiff was "ambulatory" and "alert," but that she complained of worsening neck pain.  Plaintiff's physical examination showed abnormalities in only her musculoskeletal system.  Additionally, though plaintiff had full range of motion in her extremities, she had a limited range of motion in her neck (Tr. 302, 448).  Plaintiff's discharge diagnosis was "chronic neck pain" and she was prescribed Robaxin and Tylenol (Tr. 45, 302, 448-50).

Plaintiff testified at the administrative hearing, that these medications did not help alleviate her pain and that she was in a worse condition the next day.  Specifically, plaintiff stated that "by the morning after, . . . [she] was really paralyzed and the ambulance had to come pick [her] up" (Tr. 45).  On May 27, 2007, then, plaintiff's discharge diagnosis was "chronic cervical pain."  In addition to Robaxin, plaintiff was prescribed MS Contin (Tr. 45, 301).

3.  <u>Medications</u>

Though plaintiff's treating physicians recommended that plaintiff take medication for her condition, she did not do so for the majority of the relevant time period because she was nursing.  Thus, with respect to medications, the administrative record shows only that plaintiff had been prescribed:  (1) Robaxin, Tylenol, and MS Contin in late May 2007 by Mount Sinai (<u>see</u> Tr. 45, 301-02, 448-52), (2) Celebrex in early January 2008 by LICPMR, which plaintiff began taking by early February 2008 (<u>see</u> Tr. 429-32), and (3) Cymbalta and Effexor in late July 2008 by Dr. Han (<u>see</u> Tr. 55, 445-46).

4.  <u>Consultative Physicians</u>

a.  <u>Dr. Steven Calvino</u>

On May 15, 2007, Dr. Steven Calvino performed a consultative orthopedic examination of plaintiff (Tr. 291-93).  Plaintiff reported that she had experienced (1) intermittent neck pain for the last fifteen years, and (2) constant lower back pain for the last ten years.  She rated her pain as a 7 to 8 on a 10-point scale.  Dr. Calvino noted that plaintiff had not undergone surgery, had not received therapeutic injections, and had not been taking medication to date.  Dr. Calvino also noted that

31

plaintiff attended physical therapy sessions on a weekly basis,
though she experienced little relief from her pain (Tr. 291).

Plaintiff reported that her activities of daily living
included:  cooking twice per week, doing laundry once per week,
showering and dressing herself daily, watching television and
reading.  Plaintiff also reported that she did not do any clean-
ing due to her pain, and further, that her husband did the
household shopping (Tr. 292).

After conducting a physical examination of plaintiff,
Dr. Calvino found that plaintiff's station and gait were normal
and that she did not appear to be in acute distress.  Further, he
observed that plaintiff was able to walk on her heels and toes
without difficulty and able to fully squat.  Plaintiff was also
able to change for the exam, get on and off the examination
table, and rise from a chair without assistance.  Her hand and
finger dexterity were intact and she had grip strength of 5/5 on
both sides (Tr. 292).

With respect to plaintiff's cervical spine, Dr. Calvino
noted full flexion and extension, as well as no cervical or
paracervical pain or spasm and no trigger points (Tr. 292).  With
respect to plaintiff's upper extremities, Dr. Calvino noted that
she had a full range of motion in her shoulders, elbows, fore-
arms, wrists, and fingers on both sides.  She also had full 5/5

32

strength in the proximal[39] and distal[40] muscles without muscle
atrophy or sensory abnormality.  Plaintiff's reflexes were
physiologic[41] and equal.  With respect to plaintiff's thoracic
and lumbar spines, Dr. Calvino noted full flexion and extension,
though there was "some mild tenderness to palpation[42] in the
right lumbar paraspinal region."  There were also no trigger
points.  Finally, with respect to plaintiff's lower extremities,
Dr. Calvino noted that she had a full range of motion in her
hips, knees, and ankles on both sides.  She also had 5/5 strength
in the proximal and distal muscles without muscle atrophy or
sensory abnormality.  Plaintiff had no effusion,[43] inflammation
or instability in any of her joints (Tr. 293).

   Dr. Calvino diagnosed plaintiff with chronic neck and
back pain.  He stated that plaintiff's prognosis was "good" and

---

[39]Proximal means nearest; closer to any point of reference.
Dorland's at 1562.

[40]Distal means remote; farther from any point of reference.
Dorland's at 562.

[41]Physiologic means normal; not pathologic.  Dorland's at
1464.

[42]Palpation refers to the application of the fingers with
light pressure to the surface of the body for the purpose of
determining the consistency of the parts beneath in physical
diagnosis.  Dorland's at 1386.

[43]Effusion refers to the escape of fluid into a part or
tissue.  Dorland's at 603.

his "Medical Source Statement" indicated "no restrictions" for plaintiff (Tr. 293).

                b.   <u>I. Pressman</u>

        On May 22, 2007, I. Pressman, a consultant for the SSA,[44] completed a "Physical Residual Functional Capacity Assessment" of plaintiff based on a reading of the record (Tr. 294-99). Pressman indicated that plaintiff's primary diagnosis was a "back disorder."  No secondary diagnosis was listed (Tr. 294).

        Pressman opined that plaintiff was able to:  (1) lift or carry up to fifty pounds occasionally and up to twenty-five pounds frequently, (2) stand or walk for about six hours in an eight-hour workday, (3) sit for about six hours in an eight-hour workday, and (4) push and pull objects without limitation (Tr. 295).  Pressman also opined that plaintiff could balance, stoop, kneel, crouch, and crawl only occasionally, and further, that plaintiff would "maybe [be] limited by pain."  Finally, Pressman opined that plaintiff had no manipulative, visual, communicative, or environmental limitations (Tr. 296-97).

---

    [44]The administrative record does not, nor do the parties' papers in support of their respective motions, disclose Pressman's credentials or training, if any.

In explaining these findings, Pressman noted that while plaintiff experienced tenderness in her back, her gait and station were normal and she had no motor, sensory, reflex, or neurological abnormalities (Tr. 295).  Pressman also noted plaintiff's claims that she could not clean or shop due to pain, though she could care for her personal needs and do some cooking and laundry.  However, because plaintiff did not describe the limiting effect of her pain, Pressman stated that a credibility assessment could not be made (Tr. 297-98).  Thus, Pressman concluded that plaintiff experienced no restrictions[45] (Tr. 299).

c.   Amy Leopold

On August 15, 2008, Amy Leopold, a non-physician vocational expert and certified rehabilitation counselor retained by plaintiff's counsel, provided an evaluation of plaintiff's condition based upon the record and an examination of plaintiff conducted on August 5, 2008 (Tr. 152-59).

Leopold noted that plaintiff experienced significant pain from her medical conditions, which included:  chronic lower back pain that radiated down her left leg, neck pain and result-

_____

[45]Pressman noted that while Dr. Zelefsky had given plaintiff a restricted RFC, he had not responded when contacted by the SSA for additional explanation of that determination.

ing restrictions due to a herniated disc, and a left knee condition due to a benign tumor (Tr. 152).  Leopold also noted that plaintiff was currently taking Celebrex daily, sometimes twice a day depending on the severity of her pain, and further, that she was planning to start taking either Cymbalta or Effexor (Tr. 153).

With respect to plaintiff's functional status and activities of daily living, Leopold noted much of what plaintiff had reported to her other medical examiners, i.e., that, among other things, she had gained weight due to lack of activity, she had become depressed and began struggling with anxiety, she engaged in only light cooking and her husband did the household chores and shopping, she could not stay in one position for any length of time, she could not complete any exercises, and she could not sleep throughout the night (Tr. 154).

Leopold then discussed the nature of plaintiff's past employment (see Tr. 155-57).  She described plaintiff's position as a technical designer at Ralph Lauren as involving "hands on work requiring full mobility on a continuous basis" (Tr. 155), and further, as involving light work that was skilled in nature (Tr. 157).  Additionally, the position:  (1) required the ability to exert force ranging from ten to twenty pounds, and (2) involved significant standing, walking, pushing, pulling, reaching,

36

handling, near acuity, depth perception and color vision, talk-
ing, and hearing (Tr. 157).  Based upon the foregoing, Leopold
opined that plaintiff was "totally disabled" (Tr. 157-58).
Additionally, Leopold stated that plaintiff "ha[d] less than
sedentary work capacity due to her inability to sustain one
position for any length of time and her inability to complete an
eight-hour workday" (Tr. 158).

### d.   Dr. Lauree Mitchell

On October 18, 2008, approximately one month after the
administrative hearing, Dr. Lauree Mitchell, a psychologist,
conducted a consultative psychiatric evaluation of plaintiff at
the ALJ's request (Tr. 453-57; see also Tr. 55).  Dr. Mitchell
first noted that plaintiff had never been hospitalized for
psychiatric reasons, and further, that she had only seen a
psychiatrist once (Tr. 453).  Dr. Mitchell then noted the follow-
ing about plaintiff's functioning as of the consultation date.
Plaintiff had trouble sleeping and she had gained twenty-five
pounds in the last two years.  Her depressive symptomatology
included:  dysphoric[46] mood, psychomotor[47] retardation, crying

---

[46]Dysphoric pertains to dysphoria, which in turn, refers to
disquiet, restlessness, and malaise.  Dorland's at 587.

[47]Psychomotor pertains to motor effects of cerebral or
(continued...)

spells, guilt, hopelessness, loss of usual interests, irritabil-
ity, fatigue, loss of energy, feelings of worthlessness, dimin-
ished self-esteem, and concentration difficulties (Tr. 453).  Her
anxiety-related symptomatology included:  excessive worry,
fatigue, irritability, difficulty concentrating, and the fear of
dying young (Tr. 453-54).  Finally, her cognitive symptomatology
and deficits included short-term memory deficits and concentra-
tion difficulties (Tr. 454).

      After conducting a mental status examination of plain-
tiff, Dr. Mitchell found that her manner of relating, social
skills, and overall presentation were "adequate."  Specifically,
Dr. Mitchell found that:  (1) plaintiff's gait, posture, and
motor behavior were "normal," (2) plaintiff's speech was "fluent"
and her expressive and receptive language were "adequate," (3)
plaintiff's thought processes were coherent and goal-directed
with no evidence of hallucinations, delusions, or paranoia, (4)
plaintiff was oriented to person, place, and time, (5) plain-
tiff's sensorium[48] was clear, (6) plaintiff's cognitive function-
ing was average and her general fund of information was "appro-

_____

      [47](...continued)
psychic activity.  Dorland's at 1572.

      [48]Sensorium refers to the condition of a subject relative to
the subject's consciousness or mental clarity.  Dorland's at
1718.

priate" to her experience, and (7) plaintiff's insight and judgment were "fair."  However, Dr. Mitchell also found that plaintiff's affect was depressed and that her mood was dysthymic (Tr. 454-55).  Plaintiff's attention, concentration, and recent and remote memory skills were "mostly intact" (Tr. 455).

With respect to plaintiff's activities of daily living, Dr. Mitchell noted the following.  Plaintiff dressed, bathed, and groomed herself daily, though she did not always feel like it. She cooked a few times a week and sometimes did laundry, but she did not clean.  She did the household shopping with her husband, who also managed their money.  Plaintiff was also able to take public transportation on her own.  She had a few friends that she would sometimes visit, or that would sometimes visit her, and she got along well with her family (Tr. 455).  Finally, Dr. Mitchell noted that plaintiff "spends her days taking care of her 2-year-old daughter and waiting for her older daughter to get home from school" (Tr. 455-56).

On the basis of the foregoing, Dr. Mitchell's "Medical Source Statement" indicated that plaintiff was "able to follow and understand simple directions and instructions," "perform simple tasks independently," and "maintain attention and concentration."  However, plaintiff did not seem able to maintain a regular schedule, and further, she might have been able to learn

39

new tasks only with effort.  Additionally, while plaintiff was
"able to relate adequately with others," she was "unable to deal
appropriately with stress."  Thus, Dr. Mitchell diagnosed plain-
tiff as follows:  Axis I - major depressive disorder, severe,
without psychotic features and anxiety disorder, not otherwise
specified; Axis II - no diagnosis; and Axis III - back pain, neck
pain, and left knee injury.  Dr. Mitchell recommended that
plaintiff begin psychological treatment and opined that her
prognosis was "guarded" (Tr. 456).

> 5.   Medical Evidence Submitted
>      to the Appeals Council

Plaintiff's counsel submitted additional medical
information to the Appeals Council.  This medical information
includes:  (1) a report from Dr. Zelefsky dated March 16, 2009
(Tr. 479-82), (2) a report from Dr. Scott Gray dated March 18,
2009 (Tr. 496), (3) a MRI scan of plaintiff's lumbar/sacral spine
addressed to Dr. Gray on May 26, 2009 (Tr. 497-98), (4) a Multi-
ple Impairment Questionnaire completed by Dr. Gray on June 15,
2009 (Tr. 488-95), and (5) a Lumbar Spine Impairment Question-
naire completed by Dr. Donald Goldman on August 17, 2009 as well
as an accompanying undated report (Tr. 500-10).  With the excep-
tion of Dr. Zelefsky's March 16, 2009 report, which I discuss in

40

the previous subsection entitled "Long Island City Pain Manage-
ment and Rehabilitation Offices, P.C.," I shall briefly summarize
the findings of these reports, scans, and questionnaires.

On March 18, 2009, Dr. Gray, an orthopedic surgeon,
diagnosed plaintiff's left knee as follows:  "[f]ragments of
synovial tissue showing changes consistent with pigmented
villonodular synovitis" (Tr. 496).  On May 26, 2009, the MRI scan
of plaintiff's lumbar/sacral spine revealed "grade II
spondylolisthesis of L5 on S1 secondary to bilateral spondylolsis
with bilateral foraminal stenosis and impingement felt present
upon the bilateral L5 nerve roots" (Tr. 497).

On June 15, 2009, Dr. Gray completed a Multiple Impair-
ment Questionnaire, in which he reported that he first examined
plaintiff on March 11, 2009 and that he last examined her on June
15, 2009.  His diagnosis was osteoarthritis of plaintiff's left
knee and grade II spondylolisthesis and his prognosis was "poor"
(Tr. 488).  On a scale of zero to ten, he rated her pain as an 9
to 10, and her fatigue as an 8 to 9 (Tr. 490).  He noted that
plaintiff was taking Celebrex and morphine, with stomach pain as
a side effect of both medications and fatigue as a side effect of
only the morphine (Tr. 492).

Dr. Gray opined that, in an eight-hour workday, plain-
tiff could only sit and stand/walk for two hours each and that

41

she would need to move around every thirty minutes for approxi-
mately fifteen minutes at a time (Tr. 490-91).  He further opined
that plaintiff could lift and carry objects up to ten pounds
frequently and up to twenty pounds occasionally, but that she
could never lift or carry objects above twenty pounds (Tr. 491).
Plaintiff also experienced moderate limitations in the following
activities:  grasping, turning, and twisting objects; using her
fingers and hands for fine manipulations; and using her arms for
reaching (Tr. 491-92).

        Dr. Gray also noted that plaintiff's symptoms would
likely increase if she were in a competitive work environment,
and further, that her condition would prevent her from keeping
her neck in a constant position (Tr. 492).  Plaintiff's pain and
other symptoms were also severe enough to "constantly" interfere
with her attention and concentration.  Thus, she would need to
take unscheduled breaks, most likely every forty-five minutes for
approximately ten minutes at a time (Tr. 493).

        Finally, Dr. Gray opined that:  (1) plaintiff was not
capable of even a "low stress" work environment, (2) plaintiff
would likely have to miss more than three days of work a month,
and (3) plaintiff would need to avoid pushing, pulling, kneeling,
bending, stooping, and heights (Tr. 493-94).  On the basis of the
foregoing, Dr. Gray opined that plaintiff was not capable of

performing a full-time competitive job that required activity on a sustained basis (Tr. 493).

On August 17, 2009, Dr. Goldman, an orthopedic surgeon, completed a Lumbar Spine Impairment Questionnaire, in which he reported that he had only examined plaintiff on August 11, 2009 (Tr. 500-06). Dr. Goldman's prognosis for plaintiff was "guarded." Specifically, among other things, Dr. Goldman found that plaintiff suffered from a limited range of motion, tenderness, and swelling in her left knee, as well as sensory loss and reflex changes in her right leg. There was also straight leg raising on the right (Tr. 500-01).

Dr. Goldman opined that, in an eight-hour workday, plaintiff could only sit for three to four hours and she could only stand and walk for two to three hours (Tr. 502). Plaintiff would also need to move around every twenty minutes for approximately five minutes at a time. Dr. Goldman further opined that plaintiff could lift and carry objects up to five pounds occasionally, but could never lift or carry objects above five pounds (Tr. 503). Her pain and other symptoms would be severe enough to "frequently" interfere with her attention and concentration (Tr. 504). Thus, plaintiff would need to take unscheduled breaks, mostly likely every forty-five minutes to an hour for approximately five minutes at a time (Tr. 505).

43

Finally, Dr. Goldman noted that:  (1) plaintiff's condition would prevent her from keeping her neck in a constant position, (2) plaintiff would likely have to miss more than three days of work a month, and (3) plaintiff would need to avoid any pushing, pulling, kneeling, bending, stooping, heights, and extreme temperatures.  On the basis of the foregoing, Dr. Goldman opined that plaintiff was not capable of performing a full-time competitive job that required activity on a sustained basis.  Dr. Goldman also opined that plaintiff's condition existed as early as 2006[49] (Tr. 505).

D.   <u>Proceedings Before the ALJ</u>

ALJ Jordan conducted an administrative hearing on September 23, 2008 at which plaintiff testified to the following facts.  Plaintiff lived in a second-floor apartment with her husband and two daughters, and she used the elevator instead of the stairs to get to her apartment (Tr. 33-34).  Plaintiff noted that although she could drive, she only drove her older daughter to school in the mornings -- approximately a twenty to twenty-five minute drive in each direction -- and she occasionally drove to the grocery store (Tr. 35-36).  She would also drive to some

_____

[49]Dr. Goldman's undated accompanying report is consistent with his findings discussed in the text (<u>see</u> Tr. 507-10).

of her medical appointments; however, she usually scheduled the
appointments so that her husband could drive.  Overall, plaintiff
felt that she was a hazard when driving because she would experi-
ence back pain and stiffness in her neck (Tr. 36).

Plaintiff then testified that she began to experience
back problems fairly early on in her employment with Ralph
Lauren, but that she continued to work through the pain because
she enjoyed her job and was advancing at the company.  However,
her back problems became progressively worse over the years, with
the pain spreading to her neck and knees (Tr. 40).  She testified
that all of her doctors had recommended back surgery, but that
she was afraid of the procedure (Tr. 40-41).

Plaintiff described the pain in her back as "constant"
and "stabbing," and sometimes "excruciating" (Tr. 41).  She also
stated that, at times, the pain was "really unbearable and it
even radiate[d] to [her] left leg" (Tr. 41).  Plaintiff rated her
pain as "an eight [on a scale of zero to ten] because sometimes
[she] [took] morphine . . . if [she] [could not] handle it" (Tr.
41-42).  With respect to taking Celebrex, plaintiff testified
that the medication made her "a little more comfortable" because
while "the pain [was] still there[,] [the medication] reduce[d]
the inflammation . . . . "  However, when her pain became very
severe, plaintiff explained that she had to double her dosage of

45

Celebrex.  Plaintiff also testified that she sometimes experi-
enced nausea as a side effect of Celebrex (Tr. 42).

     Plaintiff described the pain in her neck as a constant
feeling of stiffness (Tr. 53).  With respect to her knees,
plaintiff testified that a benign tumor had grown in her left
knee in approximately late 2006.  As a result, plaintiff experi-
enced inflammation in her knee, she had to have the fluid drained
from her knee on at least two occasions, and she had to wear a
knee brace.  At the time of the administrative hearing, plaintiff
stated that she was planning to undergo knee surgery later in the
year (Tr. 43-44, 53-54).

     Plaintiff also testified that in mid-2007, she was
hospitalized as a result of severe pain.  She explained that she
went to the hospital on a Friday night and was given pain medica-
tion, but the next morning she woke up feeling "paralyzed" and
unable to move her head.  Plaintiff was taken to the hospital by
an ambulance at that point and remained there for the remainder
of the weekend.  During this hospital stay, plaintiff testified
that she was first given morphine (Tr. 45).

     With respect to plaintiff's activities of daily living,
plaintiff testified that she did not really go anywhere or get
any exercise.  She testified that she basically spent her day
taking care of her two-year old daughter (Tr. 46).  While plain-

46

tiff usually took care of her younger daughter by herself, she
testified that her mother would come stay with her whenever her
pain was very severe (Tr. 46-47).  Plaintiff also testified that
she did not do much housework.  Instead, her husband would help
out with the household chores or plaintiff would hire a cleaning
lady (Tr. 47).  Plaintiff's husband also did the grocery shop-
ping; she would only go to the store if she needed "milk or
simple things" that did not involve carrying bags (Tr. 48).
Plaintiff testified that she used a dishwasher to wash dishes.
She cooked, which involved some standing and leaning over the
counter, but she made only "very easy" meals that generally took
no longer than approximately twenty-five minutes to make (Tr.
47).  Plaintiff also testified that she watched television,
though not for any particular amount of time (Tr. 48).

Since her condition worsened, plaintiff testified that
she had not engaged in many social activities.  She was not a
member of any clubs or organizations.  Once in a while, she would
go out to dinner or a movie.  She had one friend that she visited
occasionally, approximately once every three weeks. Plaintiff
also testified that she tried to bring her children to the park
that was next door to her home; however, the distance was often
too far for her to walk (Tr. 49-50).  Plaintiff also noted that

she had gained approximately twenty pounds due to a "[l]ack of physical activity" (Tr. 34).

Plaintiff further testified that she had trouble sleeping because of the pain. However, even though her doctors suggested medication, plaintiff explained that she declined to take any because she had young children in the home and she wanted to be alert in case of an emergency (Tr. 52-53).

Overall, plaintiff testified that she had become "depressed" and "irritable" toward everyone, including her husband and children (Tr. 54). Plaintiff testified that she saw a psychiatrist not long before the administrative hearing, and as a result, she was prescribed a generic version of Cymbalta -- which she was taking "most of the time" (Tr. 54-55). She noted that the medication "help[ed] a little bit" and that "some days [were] better than others" (Tr. 55). Plaintiff also testified that she began having problems with her memory in mid- to late 2007. Specifically, she had become "very forgetful," though she could still remember to take her medication and pick up her older daughter from school (Tr. 56). Plaintiff also began experiencing attention and concentration difficulties, losing interest in a task very soon after beginning it (Tr. 57).

Finally, with respect to performing sedentary work, plaintiff testified that she could not sit or stand for more than

twenty minutes to a half-hour at a time, and further, that her back would get stiff after sitting for a protracted period of time (Tr. 50-51).  Plaintiff also testified that she could not bend, stoop, or pick up heavy objects, though she could touch her knees if she were standing up (Tr. 51-52).

Andrew J. Pasternak, a non-physician vocational expert, also testified at plaintiff's administrative hearing (Tr. 58-66; see also Tr. 88).  Pasternak began by classifying plaintiff's past relevant work according to skill level and exertional level. He stated that plaintiff's employment as a technical designer and a senior technical designer was at the light exertional level -- i.e., requiring lifting up to approximately twenty pounds, as well as standing and walking for most of the workday -- and that it was "skilled job with an SVP [i.e., specific vocational preparation,][50] of 7."  Pasternak also noted that the Dictionary of Occupational Titles ("DOT") did not include bending and stooping in its position descriptions, but that those activities were involved in plaintiff's past relevant work (Tr. 58).

_____

[50]An SVP is defined as follows:  "The DOT [i.e., Dictionary of Occupational Titles,] lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 [C.F.R.] [§§] 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  SSR 00-4P, 2000 WL 1898704 at *3.

The ALJ first asked Pasternak to consider whether an individual of plaintiff's age, education, and past relevant work experience could perform her past work with the following restrictions:  (1) lifting, carrying, pushing, and pulling objects no more than ten pounds occasionally, (2) sitting no more than six hours and standing no more than two hours in an eight-hour workday, (3) having the option to sit and stand every fifteen to thirty minutes, and (4) avoiding crawling, kneeling, squatting, climbing ladders, ropes, scaffolds, and overhead reaching, lifting, and carrying -- though the individual could still bend from the waist to knee level.  Pasternak responded that this individual would not be able to do plaintiff's past relevant work; however, there was other work that existed in the national economy for this individual to perform because of transferable skills, i.e., computer skills, calculation skills, and "hands[-]on skills" (Tr. 59-60).  Specifically, these positions were: (1) a receptionist position, described as "semi-skilled with an SVP of 4 (DOT § 237.367-038)," and (2) two types of cashier positions, described as "semi-skilled, each [with] an SVP of 3 (DOT §§ 211.482-014, 211.462-026)" (Tr. 60).

The ALJ next asked Pasternak to consider whether an individual with the same characteristics and restrictions listed above -- but with the additional limitation of only being able to

50

perform "simple, routine, [and] unskilled tasks because [of]
moderate deficiencies in concentration, persistence, and pace" --
could perform any unskilled jobs.  Pasternak responded that such
an individual could perform a variety of unskilled jobs.  Specif-
ically, he listed the following positions:  (1) an order clerk
position, described as "unskilled with an SVP of 2" (DOT
§ 209.587-014), and (2) sedentary assembly jobs, described as
"unskilled" and with a SVP of 2 (DOT §§ 706.684-030, 713.687-018,
715.684-082, 739.684-094) (Tr. 61).

        The ALJ lastly asked Pasternak to consider whether an
individual with the same characteristics listed above and the
following restrictions could perform any work in the national
economy:  (1) sitting no more than four hours and standing no
more than two hours in an eight-hour day, (2) lifting no more
than twenty pounds occasionally, (3) an inability to handle a low
stress work environment, (4) an inability to push, pull, kneel,
bend, and stoop, and (5) a need to avoid wetness, noise, fumes,
gasses, temperature extremes, humidity, dust and heights (Tr.
61).  Pasternak responded that this individual would not be able
to perform any work in the national economy (Tr. 62).

        At the close of the administrative hearing, Pasternak
confirmed that his testimony was consistent with the DOT, except
that the DOT did not include a sit/stand option for the positions

51

that were identified during his testimony (Tr. 65).  Pasternak
explained, however, that the availability of a sit/stand option
in these positions was based upon his experience of over thirty
years (Tr. 63, 65).

III. <u>Analysis</u>

    A.  Applicable Legal
       <u>Principles</u>

       1.  <u>Standard of Review</u>

     The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008);
<u>Shaw v. Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Tejada v.
Apfel</u>, 167 F.3d 770, 773-74 (2d Cir. 1999); <u>Bubnis v. Apfel</u>, 150
F.3d 177, 181 (2d Cir. 1998).

     The Court first reviews the Commissioner's decision for
compliance with the correct legal standards; only then does it
determine whether the Commissioner's conclusions were supported
by substantial evidence.  <u>Tejada v. Apfel</u>, <u>supra</u>, 167 F.3d at
773-74; <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987);
<u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y. 2009)

(Marrero, D.J.).  "Even if the Commissioner's decision is sup-
ported by substantial evidence, legal error alone can be enough
to overturn the ALJ's decision." Ellington v. Astrue, supra, 641
F. Supp. 2d at 328; accord Johnson v. Bowen, supra, 817 F.2d at
986.  However, "where application of the correct legal principles
to the record could lead to only one conclusion, there is no need
to require agency reconsideration." Johnson v. Bowen, supra, 817
F.2d at 986.

          "The Supreme Court has defined substantial evidence as
'more than a mere scintilla' and as 'such relevant evidence as a
reasonable mind might accept as adequate to support a conclu-
sion.'" Quinones v. Chater, 117 F.3d 29, 33 (2d Cir. 1997),
quoting Richardson v. Perales, 402 U.S. 389, 401 (1971).  "Conse-
quently, where [there is] substantial evidence . . . this Court
may not substitute its own judgment as to the facts, even if a
different result could have been justifiably reached upon de novo
review." Beres v. Chater, No. CV-93-5279 (JG), 1996 WL 1088924
at *5 (E.D.N.Y. May 22, 1996); see also Valente v. Sec'y of
Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).  Thus,
"'[t]o determine on appeal whether an ALJ's findings are sup-
ported by substantial evidence, a reviewing court considers the
whole record, examining the evidence from both sides, because an
analysis of the substantiality of the evidence must also include

that which detracts from its weight.'" <u>Terwilliger v. Comm'r of</u>
<u>Soc. Sec.</u>, No. 3:06-CV-0149 (FJS/GHL), 2009 WL 2611267 at *2
(N.D.N.Y. Aug. 24, 2009), <u>citing</u> <u>Williams v. Bowen</u>, 859 F.2d 255,
258 (2d Cir. 1988).

       2.  Determination of
          <u>Disability</u>

      Under Title II of the Social Security Act, 42 U.S.C.
§§ 401 <u>et</u> <u>seq.</u>, a claimant is entitled to disability benefits if
he or she can establish an "inability to engage in any substan-
tial gainful activity by reason of any medically determinable
physical or mental impairment . . . which has lasted or can be
expected to last for a continuous period of not less than 12
months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); <u>see</u> <u>also</u>
<u>Barnhart v. Walton</u>, 535 U.S. 212, 217-22 (2002) (both impairment
and inability to work must last twelve months).  The impairment
must be demonstrated by "medically acceptable clinical and
laboratory diagnostic techniques," 42 U.S.C. §§ 423(d)(3),
1382c(a)(3)(D), and it must be

          of such severity that [the claimant] is not only unable
          to do his previous work but cannot, considering [the
          claimant's] age, education, and work experience, engage
          in any other kind of substantial gainful work which
          exists in the national economy, regardless of whether
          such work exists in the immediate area in which [the
          claimant] lives, or whether a specific job vacancy

exists for [the claimant], or whether [the claimant]
would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and
subjective factors when assessing a disability claim, including:
(1) objective medical facts and clinical findings; (2) diagnoses
or medical opinions of examining physicians; (3) subjective
evidence of pain or disability to which the claimant and family
or others testify; and (4) the claimant's educational background,
age and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d
Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir.
1983).

"In evaluating disability claims, the [Commissioner] is
required to use a five-step sequence, promulgated in 20 C.F.R.
§§ 404.1520, 416.920."  Bush v. Shalala, 94 F.3d 40, 44 (2d Cir.
1996).

First, the Commissioner considers whether the claimant
is currently engaged in substantial gainful activity.
Where . . . the claimant is not so engaged, the Commis-
sioner next considers whether the claimant has a "se-
vere impairment" that significantly limits his physical
or mental ability to do basic work activities . . . .
Where the claimant does suffer a severe impairment, the
third inquiry is whether, based solely on medical
evidence, he has an impairment listed in Appendix 1 of
the regulations or equal to an impairment listed
there . . . .  If a claimant has a listed impairment,
the Commissioner considers him disabled.  Where a
claimant does not have a listed impairment, the fourth
inquiry is whether, despite his severe impairment, the

55

> claimant has the residual functional capacity to per-
> form his past work . . . . Finally, where the claimant
> is unable to perform his past work, the Commissioner
> then determines whether there is other work which the
> claimant could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,

388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds on

rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger v.

Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, supra,

221 F.3d at 132; Brown v. Apfel, supra, 174 F.3d at 62; Tejada v.

Apfel, supra, 167 F.3d at 774; Rivera v. Schweiker, supra, 717

F.2d at 722.

Step four requires that the ALJ make a determination as

to the claimant's residual functional capacity ("RFC").  See

Sobolewski v. Apfel, 985 F. Supp. 300, 309 (E.D.N.Y. 1997).  RFC

is defined in the applicable regulations as "the most [the

claimant] can still do despite [his] limitations."  20 C.F.R.

§§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ

makes a "function by function assessment of the claimant's

ability to sit, stand, walk, lift, carry, push, pull, reach,

handle, stoop, or crouch."  Sobolewski v. Apfel, supra, 985 F.

Supp. at 309.  The results of this assessment determine the

claimant's ability to perform the exertional demands of sustained

work, and may be categorized as sedentary,[51] light,[52] medium, heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Burgess v. Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra, 335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than the claim-ant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step of the sequential evaluation process described above, the Commissioner, under appropriate circumstances, may rely on the medical-vocational guidelines contained in

---

[51]Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday.  SSR 96-9p, 1996 WL 374185 at *3 (1996); see 20 C.F.R. §§ 404.1567(a), 416.967(a).  Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. §§ 404.1567(a), 416.967(a).

[52]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).  Light work often "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls."  20 C.F.R. § 404.1567(b), 416.967(b).

> 20 C.F.R. Part 404, Subpart P, App. 2, commonly re-
> ferred to as "the Grid."  The Grid takes into account
> the claimant's RFC in conjunction with the claimant's
> age, education and work experience.  Based on these
> factors, the Grid indicates whether the claimant can
> engage in any other substantial gainful work which
> exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl,

D.J.).  When a claimant retains the RFC to perform at least one

of the categories of work listed on the Grid, and when the

claimant's educational background and other characteristics are

also captured by the Grid, the ALJ may rely exclusively on the

Grid in order to determine whether the claimant retains the RFC

to perform some work other than his or her past work.  Butts v.

Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the

Commissioner meets his burden at the fifth step by resorting to

the applicable medical vocational guidelines (the [Grid]).")

(internal quotation and citation omitted).

       However, "exclusive reliance on the [Grid] is inappro-

priate" where non-exertional limitations "limit the range of

sedentary work that the claimant can perform."  Butts v.

Barnhart, supra, 388 F.3d at 383, quoting Rosa v. Callahan, 168

F.3d 72, 78 (2d Cir. 1999) (internal quotation omitted); Bapp v.

Bowen, supra, 802 F.2d at 603.  When a claimant suffers from a

non-exertional limitation such that she is "unable to perform the

full range of employment indicated by the [Grid]," Bapp v. Bowen,

supra, 802 F.2d at 603, or the Grid fails "to describe the full
extent of [the] claimant's physical limitations," the Commis-
sioner must offer the testimony of a vocational expert in order
to prove "that jobs exist in the economy which the claimant can
obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at 383
(internal quotation and citation omitted from first quotation);
see 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(e); see also
Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an indi-
vidual's capabilities are not described accurately by a rule, the
regulations make clear that the individual's particular limita-
tions must be considered.").

### 3.   Treating Physician Rule

When considering the evidence in the record, the ALJ is
required to give deference to the opinions of a claimant's
treating physicians.  Under the regulations' "treating physician
rule," a treating physician's opinion will be given controlling
weight if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in . . . [the] record."  20 C.F.R.
§ 404.1527(d)(2); Shaw v. Chater, supra, 221 F.3d at 134; Diaz v.
Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v.
Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must apply various factors to determine the amount of weight the opinion should be given. These factors include:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical support for the treating physician's opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's level of specialization in the area; and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and Recommendation of Freeman, M.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12. 1996) (McKenna, D.J.).  "[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight.  20 C.F.R. § 404.1527(d)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n.3 (S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

B.    The ALJ's Decision

The ALJ first noted that plaintiff met the disability insured status requirements through December 31, 2012 (Tr. 15). The ALJ then applied the five-step analysis described above, relying on the medical evidence and plaintiff's testimony to determine that plaintiff was not disabled (Tr. 15-27).

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since August 1, 2006, the alleged onset date of her disability (Tr. 15).

At step two, the ALJ found that plaintiff had the following severe impairments:  (1) disorders of the lumbar and cervical spine, (2) left knee disorder, and (3) major depressive disorder and anxiety disorder since August 2008 (Tr. 15).

At step three, the ALJ found that none of plaintiff's physical or mental impairments, either singly or in combination, were severe enough to meet or medically equal the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1[53] (Tr. 15).

At step four, the ALJ determined plaintiff's RFC, and further, that she was unable to perform her past relevant work based on that RFC (Tr. 16-25).  The ALJ concluded that plaintiff

_____

[53]Because the plaintiffs do not object to this portion of the ALJ's decision, I do not address the ALJ's rationale at step three of the analysis.

had the RFC to perform sedentary work, except that she needed the option to alternate between sitting and standing approximately every fifteen to thirty minutes.  With that option, the ALJ found that plaintiff could sit approximately six hours in an eight-hour workday, stand for approximately two hours in an eight-hour workday, and could lift and carry as well as push and pull up to ten pounds occasionally.  Additionally, plaintiff would need to avoid crawling, kneeling, squatting, and climbing ladders, ropes, or scaffolds, but she could perform other postural movements like bending from the waist to the knee level occasionally.  She also would need to avoid overhead lifting and carrying.  Finally, because of pain, depression, and medications, plaintiff would be limited to simple, routine, and unskilled tasks secondary to moderate deficiencies in concentration, persistence, or pace (Tr. 16-17).

In determining plaintiff's RFC, the ALJ first reviewed the medical evidence in the record (Tr. 16-25).  After reviewing that evidence, the ALJ stated that he had considered plaintiff's symptoms and allegations, however:

> [despite plaintiff's allegations and the existence of positive medical findings from her treating sources' examinations,] electrodiagnostic testing of [plaintiff's] cervical and lumbar spine in September 2006 was normal, straight leg raising was normal at times, sensation and gait were normal, and muscle strength was good.  The evidence from the treating sources [also]

revealed that there was no muscle atrophy. [In fact,]
[i]n as recent as October 2007, the treating source
related that the claimant had normal muscle bulk and
tone of all major muscle groups.  Additionally, the
findings of an impartial consultative examiner were
unremarkable.  [Plaintiff's] allegations regarding the
left knee are inconsistent with the findings of the
treating source that revealed mainly normal flexion and
extension and revealed normal gait . . . . Further, the
physical therapist reported [that] the claimant's
condition was well-controlled, and she had good toler-
ance for tasks.

(Tr. 23).  The ALJ also noted that while plaintiff alleged

feeling "nervous" and "depressed," she had only visited a psychi-

atrist once in mid-2008.  Further, the findings from that exami-

nation were "mainly unremarkable," other than depressed affect

and dysthymic mood.  Additionally, plaintiff's "[a]ttention and

concentration and recent memory skills were mostly intact and

cognitive functioning appeared to be of average range."  The ALJ

then noted, without explanation, that plaintiff's daily activi-

ties contradicted her allegations (Tr. 23).

     With respect to plaintiff's credibility, the ALJ stated

that while plaintiff's medically determinable impairments could

reasonably be expected to cause her alleged symptoms, "her

statements concerning the intensity, persistence and limiting

effects of these symptoms [were] not credible to the extent

[that] they [were] inconsistent with the [established RFC]

assessment."  First, the ALJ noted again that the medical records

63

had revealed "mainly unremarkable" neurological findings, as well
as good muscle strength and no muscle atrophy.  Second, the ALJ
noted that throughout the relevant period, and as late as October
2007, plaintiff did not take medication for her condition because
she was nursing.  She had only been given morphine at Mount Sinai
in May 2007 and she had been prescribed Celebrex by Dr. Zelefsky
in January 2008.  The ALJ also noted that plaintiff testified
that once she began taking Celebrex, it eased her pain.  Finally,
the ALJ noted that plaintiff engaged in a variety of physical
activities including:  driving, using public transportation,
cooking and shopping at times, washing dishes, watching televi-
sion and reading, visiting friends, going to restaurants occa-
sionally, doing laundry once a week, and caring for her children
on her own (Tr. 24).

          In addition to assessing plaintiff's credibility, the
ALJ briefly stated the extent to which he weighed the respective
opinions of several physicians (see Tr. 24-25).  He accepted and
gave significant weight to Dr. Hughes' opinion that plaintiff
could work with certain limitations.  He rejected, however, the
portion of Dr. Hughes' opinion that stated plaintiff was unable
to sit for longer than 20 minutes at a time because of the
"medical findings of treating and examining sources and the
claimant's activities" (Tr. 24).  Second, he accepted and gave

significant weight to Dr. Zelefsky's opinion, but "only to the
extent [that the opinion] was consistent with the medical find-
ings, especially, the mainly negative neurological findings, the
claimant's daily activities and functional capabilities as set
forth in her own testimony and in the record[,] and the estab-
lished [RFC], which is based on the record as a whole."  Finally,
he accepted and gave significant weight to Dr. Mitchell's opinion
that plaintiff could follow and understand simple directions and
instructions, perform simple tasks independently, maintain
attention and concentration, make appropriate decisions, and
relate adequately to others because it was "consistent with the
lack of psychiatric treatment, the mental status findings, and
the claimant's daily functioning."  He rejected, however, the
portion of Dr. Mitchell's opinion that stated plaintiff did not
appear to be able to maintain a regular schedule or deal with
work stress appropriately.  This finding, the ALJ stated, was
"not consistent with the findings [of plaintiff's] mental exami-
nation, the lack of ongoing psychiatric treatment and her activi-
ties of daily living, including caring for a two-year-old" (Tr.
25).

          At step five, the ALJ found that there were several
jobs that existed in significant numbers in the national economy
that plaintiff could perform given her [RFC], age, education, and

past work experience (Tr. 25-26).  He noted that plaintiff was a
"younger individual," being thirty-three years of age on her
alleged disability onset date, and that she also had at least a
high school education.  He mentioned that transferability of
skills would not be an issue because plaintiff was "not disabled"
whether or not she had transferable job skills (Tr. 25).  Based
on these vocational factors and plaintiff's RFC to perform
sedentary work with a sitting/standing option and other specific
limitations, the ALJ found plaintiff was not disabled under 20
C.F.R. Part 404, Subpart P, Appendix 2 (Tr. 25-26).

        The ALJ then found that, based on Pasternak's testimony
at the administrative hearing, plaintiff's RFC would allow her to
perform jobs such as order clerk and assembly worker -- which
both existed in the national and regional economies.  The ALJ
also noted that while the DOT did not account for a
sitting/standing option, Pasternak's testimony about the avail-
ability of such an option in these jobs was consistent with his
years of experience (Tr. 26).

        C.   Analysis of the
             ALJ's Decision

        As noted above, plaintiff argues that (1) the ALJ

66

violated the treating physician rule, (2) the ALJ incorrectly concluded that plaintiff's RFC would allow her to perform sedentary work with some restrictions, and (3) the ALJ's evaluation of plaintiff's credibility was erroneous (Pl.'s Mem. at 16-25).

       1.   <u>Legal Error</u>

           a.   Treating Physician Rule
                and Residual Functional
                <u>Capacity Assessment</u>

With respect to the treating physician rule, plaintiff argues that the ALJ failed to give controlling weight to the opinions of plaintiff's treating physicians when he was required to do so.  Additionally, plaintiff argues that the ALJ's explanation for giving significant weight to only certain portions of Dr. Zelefsky's opinion failed to comply with the specificity requirement set forth in Social Security Ruling (SSR) 96-2p (Pl.'s Mem. at 17-20).

An initial question is which of plaintiff's physicians is properly considered a treating physician.  In plaintiff's motion papers, there are scattered references to Drs. Zelefsky, Goldman, Cohen, Besser, and Gray (Pl.'s Mem. at 17-20).  I note at the outset that Drs. Goldman and Gray examined plaintiff a few

months after the ALJ's decision was issued.  Thus, there were no
medical records from either physician for the ALJ to consider.

Additionally, Drs. Cohen and Goldman only examined
plaintiff once (see Tr. 167-71, 203-07, 271-75, 339-43, 500-10)
and Dr. Gray only examined plaintiff twice (see Tr. 488-95).  A
physician who has examined a claimant on one or two occasions is
generally not considered a treating physician.  See 20 C.F.R.
§ 404.1502 ("We may consider an acceptable medical source who has
treated or evaluated you only a few times or only after long
intervals (e.g., twice a year) to be your treating source if the
nature and frequency of the treatment or evaluation is typical
for your condition(s)."); see also Shatraw v. Astrue, No.
7:04-CV-0510 (NAM/RFT), 2008 WL 4517811 at *10 (N.D.N.Y. Sept.
30, 2008) ("Doctors who see a patient only once do not have a
chance to develop an ongoing relationship with the patient, and
therefore are not generally considered treating physicians."),
citing Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) and
Schisler v. Bowen, 851 F.2d 43, 45 (2d Cir. 1988); accord Garcia
v. Barnhart, 01 Civ. 8300 (GEL), 2003 WL 68040 at *5 n.4
(S.D.N.Y. Jan. 7, 2003) (Lynch, then D.J., now Cir. J.).

With respect to Dr. Besser, as already discussed, the
administrative record does not clearly set forth the duration and
extent of his treatment of plaintiff -- though it appears that he

treated plaintiff beginning in early May 2007 through late April 2008 (see Tr. 408, 422, 442; see also Tr. 44).  In any event, plaintiff does not identify, nor can I ascertain, the particular findings or opinions that the ALJ failed to properly credit. Thus, I shall only address the issue of whether the ALJ properly applied the treating physician rule to Dr. Zelefsky.

While the ALJ stated that he gave Dr. Zelefsky's opinion "significant weight," he stated that he was doing so "only to the extent that [his opinion was] consistent with the medical findings, especially the mainly negative neurological findings, the claimant's daily activities and functional capabil- ities as set forth in her own testimony and in the record and the established residual functional capacity, which is based on the record as a whole" (Tr. 25).  From the ALJ's decision, however, it is unclear (1) which findings of Dr. Zelefsky's were given significant weight and which were not, and (2) whether the findings that did not receive significant weight were given any weight or whether they were rejected outright.

First, as already noted, even if an ALJ determines that a treating physician's opinion is not entitled to "controlling weight," the ALJ is required to consider the factors set forth in 20 C.F.R. § 404.1527(d)(2)-(6) in determining what weight should be given to that opinion.  "Treating source medical opinions are

69

still entitled to deference . . . . [and] [i]n many cases, [the opinion] will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p, 1996 WL 374188 at *1, *4.  Further, an ALJ is required to give "good reasons" for declining to give controlling weight to a treating physician's opinion pursuant to 20 C.F.R. § 404.1527(d)(2).  Thus, an ALJ's "[f]ailure to apply the necessary factors and to give 'good reasons' for discounting the opinions of treating physicians is an error of law" that requires remand.  Vernon v. Astrue, 06 Civ. 13132 (RMB)(DF), 2008 WL 5170392 at *19 (S.D.N.Y. Dec. 9, 2008) (Berman, D.J.); see also Torregrosa v. Barnhart, CV-03-5275 (FB), 2004 WL 1905371 at *6 & n.5 (E.D.N.Y. Aug. 27, 2004); Aronis v. Barnhart, 02 Civ. 7660 (SAS), 2003 WL 22953167 at *5 (S.D.N.Y. Dec. 15, 2003) (Scheindlin, D.J.); accord Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009); Halloran v. Barnhart, 362 F.3d 28, 32-33 (2d Cir. 2004).

Although it is not entirely clear from the ALJ's decision, it appears that the ALJ did not give significant weight to the following findings of Dr. Zelefsky:[54]  (1) that plaintiff

---

[54]This is based upon a comparison of the ALJ's determination of plaintiff's residual functional capacity (see Tr. 16-17) to Dr. Zelefsky's opinion about plaintiff's ability to work dated
                                                      (continued...)

could sit no more than four hours in an eight-hour workday, (2) that plaintiff could not push, pull, bend, or stoop, and (3) that plaintiff was unable to perform a full-time competitive job that required activity on a sustained basis.[55]  In addition to the ALJ's failure to identify the portions of Dr. Zelefsky's opinion that he found were not entitled to controlling weight under the treating physician rule, he also failed to "perform the proper analysis to determine what degree of non-controlling weight to give [to the 'rejected' portions of the opinion]."  Taylor v. Astrue, CV-07-3469 (FB), 2008 WL 2437770 at *3 (E.D.N.Y. June 17, 2008) (emphasis in original).

Specifically, the ALJ did not discuss the length of the treatment relationship between Dr. Zelefsky and plaintiff, the frequency of plaintiff's examinations by Dr. Zelefsky, the nature

---

[54](...continued)
April 4, 2007 (see Tr. 303-309).

[55]I do note that "special significance is not given to treating source opinions that a claimant is 'disabled' or is unable to work, as determinations of this kind are strictly reserved to the ALJ."  Jones v. Barnhart, 02 Civ. 0791 (SHS), 2003 WL 941722 at *10 (S.D.N.Y. Mar. 7 2003) (Stein, D.J.), citing 20 C.F.R. §§ 404.1527(e), 416.927(e); see also SSR 96-5p, 1996 WL 374183 at *2.  In any event, "opinions from any medical source on issues reserved to the Commissioner must never be ignored . . . . If the case record contains [such an opinion] . . . the adjudicator must evaluate all the evidence in the case record to determine the extent to which the opinion is supported by the record . . . . [by applying the] factors in 20 [C.F.R.] [§] 404.1527(d) . . . . "  SSR 96-5p, 1996 WL 374183 at *3.

and extent of plaintiff's treatment by Dr. Zelefsky, or Dr.
Zelefsky's level of specialization.  Instead, at the outset of
his analysis, the ALJ merely stated that he had "considered
opinion evidence in accordance with the requirements of 20
[C.F.R. §] 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p" (Tr.
17).  Further, in discussing the weight given to Dr. Zelefsky's
opinion, the ALJ merely stated that he was giving Dr. Zelefsky's
opinion significant weight "only to the extent" that the opinion
was not inconsistent with the medical record, plaintiff's testi-
mony, and plaintiff's established RFC which had been "based on
the record as a whole" (Tr. 25).

        Merely reciting the applicable legal standards and the
medical evidence in the record -- followed by the vague and
conclusory statement noted above -- is insufficient for the ALJ
to discharge his obligation under the SSA regulations and
rules.[56]  As a result of the ALJ's errors, it is unclear what
weight -- if any -- was given to these unidentified but "incon-
sistent" portions of Dr. Zelefsky's opinion.  Additionally, an

---

[56]After providing an overview of the medical evidence, the
ALJ discussed what he believed the medical evidence showed with
respect to the severity of plaintiff's condition (see Tr. 23-24).
However, this generalized discussion -- which has already been
described in the text under the section entitled "The ALJ's
Decision" -- does not cure the deficiencies with respect to the
ALJ's specific treatment of Dr. Zelefsky's opinion.

ALJ must always give good reasons for declining to give a treat-
ing physician's opinion controlling weight, see 20 C.F.R.
§ 404.1527(d)(2), and this was not done in plaintiff's case.  See
also Schisler v. Sullivan, supra, 3 F.3d at 568; Burris v.
Chater, supra, 1996 WL 148345 at *6 n.3.

        Second, in finding that plaintiff was not disabled, the
ALJ placed great emphasis on the medical findings that plaintiff
retained good muscle strength and experienced no muscle atrophy
(see Tr. 23-24).  However, the Second Circuit has stated that
"[this Court has] found that an ALJ had improperly made a medical
determination [at the expense of properly applying the treating
physician rule] by concluding that an absence of 'atrophy of any
muscle groups' was inconsistent with a finding of disability."[57]

_____

        [57]In Balsamo v. Chater, supra, 142 F.3d at 81, the Second
Circuit stated:

            "[T]he ALJ stated without citing to any medical opinion
            that 'there is no atrophy of any muscle group
            indicative of disuse for the purpose of avoiding
            discomfort [ ] as one would expect . . . based on the
            claimant's allegation of constant and totally disabling
            pain.'  In so finding, the ALJ plainly did not 'choose
            between properly submitted medical opinions,' but
            rather improperly 'set his own expertise against that
            of [ ] physician[s]' who submitted opinions to him."

While this quotation states that there were no medical findings
in the record with respect to the plaintiff's muscle atrophy or
lack thereof, the reasoning is equally applicable here because
the findings that plaintiff retained good muscle strength and
                                              (continued...)

73

Rosa v. Callahan, supra, 168 F.3d at 79, quoting Balsamo v.
Chater, supra, 142 F.3d at 81.

Finally, it appears that in determining the weight to
give Dr. Zelefsky's opinion, the ALJ considered whether the
opinion was consistent with his determination of plaintiff's RFC.
This is improper because an RFC can only be determined "based on
all the relevant evidence in [the] case record," 20 C.F.R.
§ 404.1545(a)(1), which necessarily includes the opinion of a
plaintiff's treating physician.  See also SSR 96-5p, 1996 WL
374183 at *4-*5.  Thus, the ALJ should not have reached a conclu-
sion with respect to plaintiff's RFC and then used that RFC to
discount the non-conforming portions of Dr. Zelefsky's opinion.
Instead, the ALJ should have determined the weight to be given to
Dr. Zelefsky's opinion prior to making the ultimate RFC determi-
nation.

With respect to plaintiff's RFC, she argues that the
reports of Drs. Hughes and Zelefsky were inconsistent with the
ALJ's RFC determination, and further, that, pursuant to Social

_____

[57](...continued)
experienced no muscle atrophy came primarily from Dr. Zelefsky --
plaintiff's treating physician who opined that, despite those
findings, plaintiff had serious restrictions on her ability to
work.

Security Ruling ("SSR") 96-9[p],[58] the ALJ failed to incorporate her inability to stoop in the RFC determination as well as failed to question Pasternak about it at the administrative hearing. Plaintiff also argues that the ALJ asked Pasternak an improper hypothetical question at the hearing because "[a]n ALJ cannot generally account for a claimant's deficiencies in concentration, persistence, and pace by restricting the vocational expert's inquiry to simple, routine tasks or unskilled work" (Pl.'s Mem. at 21-22).  Finally, plaintiff argues that, pursuant to SSR 00-4p, Pasternak's testimony "did not conform to the DOT" because there were "inconsistencies between the jobs he identified and the same jobs as [they were] described in the DOT" (Pl.'s Mem. at 23).

The ALJ failed to assess properly plaintiff's ability to stoop in making a determination about her RFC, which as the ALJ even determined, was very limited.[59]  As already noted, "[i]n determining a claimant's capacity to perform work-related physi-

---

[58]Though plaintiff refers to the applicable ruling as "SSR 96-9" (see Pl.'s Mem. at 21), the correct ruling is "SSR 96-9p."

[59]I do not reach all of plaintiff's arguments with respect to (1) the ALJ's determination of her RFC at step four, and (2) whether the ALJ carried his burden at step five of the analysis because I find that, on the basis of the treating physician rule alone, remand is proper.  Notwithstanding this, I discuss plaintiff's argument that the ALJ failed to incorporate her inability to stoop into the RFC assessment because that was one finding from Dr. Zelefsky that the ALJ explicitly rejected.

cal activities, the claimant's ability to sit, stand, walk, lift, carry, push, and pull must be considered, as well as her ability to reach, handle, stoop, or crouch." <u>Sobolewski v. Apfel</u>, <u>supra</u>, 985 F. Supp. at 309, <u>citing</u> 20 C.F.R. § 404.1545(b).  With respect evaluating a claimant's ability to do less than a full range of sedentary work, which is the case here, "[a]n ability to stoop occasionally . . . is required in most unskilled sedentary occupations."  SSR 96-9p, 1996 WL 374185 at *8.  As a result:

> A <u>complete</u> inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work.  Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.

SSR 96-9p, 1996 WL 374185 at *8.

In plaintiff's case, both Drs. Hughes and Zelefsky commented that plaintiff had a work-related restriction with respect to stooping.  Specifically, Dr. Hughes stated that plaintiff "could work as long as she did not have to bend, stoop, sit in one position, or work at a computer for greater than 20 minutes" (Tr. 281) and Dr. Zelefsky stated that plaintiff would need to not stoop if she was performing a regular job on a sustained basis (Tr. 309).  The ALJ, however, did not discuss plaintiff's ability to stoop in his decision nor did he mention

it in his ultimate RFC determination despite (1) the ALJ's
acknowledgment of Drs. Hughes and Zelefsky's findings on the
issue (see Tr. 19-21), (2) plaintiff's testimony at the adminis-
trative hearing that she had problems with stooping and bending,
though she could touch her knees (see Tr. 51-52), and (3) the
ALJ's own use of an inability to stoop in one of the hypothetical
questions asked of Pasternak at the administrative hearing (see
Tr. 61).  The failure of the ALJ to make an explicit finding with
respect to plaintiff's ability to stoop in light of her many
other work-related restrictions, even though he addressed her
ability to bend, was error.[60]  See Molina v. Barnhart, 04 Civ.
3201 (GEL), 2005 WL 2035959 at *8 (S.D.N.Y. Aug. 17, 2005)
(Lynch, then D.J., now Cir. J.).

---

[60]Respondent contends that "there is no medical evidence
showing [that] plaintiff had an inability to stoop" and that the
medical evidence instead showed that plaintiff "had a normal
gait, could heel and toe walk, could perform a full squat, had no
trouble getting on and off the examination table, and could rise
from a chair without difficulty" (Def.'s Mem. at 18 n.8).  This
is incorrect, as Drs. Hughes and Zelefsky specifically opined on
plaintiff's ability to stoop.  The findings that respondent
cites, then, would create a question as to whether plaintiff had
the ability to stoop and if that is the case -- the ALJ should
have further developed the record on the issue.  See Pratts v.
Chater, 94 F.3d 34, 37 (2d Cir. 1996); Perez v. Chater, 77 F.3d
41, 47 (2d Cir. 1996); see also Halloran v. Barnhart, 362 F.3d
28, 31 (2d Cir. 2004); Echevarria v. Sec'y of Health & Human
Servs., 685 F.2d 751, 755 (2d Cir. 1982).

Thus, on remand, the ALJ should properly apply the treating physician rule to Dr. Zelefsky as well as make a RFC finding with respect to plaintiff's ability to stoop.

### b.   Plaintiff's Credibility

Plaintiff also argues that, pursuant to 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3), and SSR 96-7p, the ALJ improperly evaluated her credibility with respect to her statements about the intensity, persistence, and limiting effects of her pain.  Specifically, plaintiff argues that (1) the lack of muscle atrophy or abnormal electromyogram[61] findings did not render her allegations of pain incredible, and (2) in any event, there was an "overwhelming amount of objective, subjective, and clinical evidence in the administrative record" that corroborated [her] allegations of pain" (Pl.'s Mem. at 24).

It is "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology."

---

[61]Electromyogram refers to the record obtained by electromyography, which in turn, refers to an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation.  Dorland's at 609.

Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995)
(Leisure, D.J.), accord Mimms v. Heckler, 750 F.2d 180, 186 (2d
Cir. 1984); Richardson v. Astrue, 09 Civ. 1841 (SAS), 2009 WL
4793994 at *6 n.97 (S.D.N.Y. Dec. 14, 2009) (Scheindlin, D.J.);
see Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d
588, 591 (2d Cir. 1984); Carroll v. Sec'y of Health & Human
Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of
the [Commissioner], not [the reviewing courts], to resolve
evidentiary conflicts and to appraise the credibility of wit-
nesses, including the claimant.").

       In evaluating plaintiff's credibility, the ALJ stated
that her "alleged pain and limited ability to perform physical
activity" were contradicted by "[the] medical findings of treat-
ing and examining sources, [her] positive response to physical
therapy, the lack of prescribed medication for a long period of
time, [her] testimony that she obtained relief with Celebrex
without experiencing significant side effects, and her activi-
ties, especially caring for a two-year-old child" (Tr. 24).  To
the extent that the ALJ based his determination of plaintiff's
credibility on the record as a whole, there is no legal error.
See 20 C.F.R. § 404.1529(c); see generally SSR 96-7p, 1996 WL
374186.

79

However, like the ALJ's explanation of the weight he had given to Dr. Zelefsky's opinion, he noted that plaintiff's allegations were incredible "to the extent [that] they [were] inconsistent with [plaintiff's established] residual functional capacity assessment" (see Tr. 24).  Thus, it appears that the same error that occurred with the application of the treating physician rule to Dr. Zelefsky occurred with respect to the assessment of plaintiff's credibility.  If, as his opinion suggests, the ALJ made a determination of plaintiff's RFC without considering plaintiff's allegations of pain and resulting limitations and then used that RFC to discount plaintiff's non-conforming allegations and resulting limitations, the RFC analysis was improperly performed.  On remand, then, the ALJ should also reassess plaintiff's credibility.

        2.   Substantial Evidence

        Because I find legal error requiring remand, I need not consider whether the ALJ's decision was supported by substantial evidence.  See Johnson v. Bowen, supra, 817 F.2d at 986; Ellington v. Astrue, supra, 641 F. Supp. 2d at 328.  In any event, plaintiff does not argue that the ALJ's decision was not supported by substantial evidence (see generally Pl.'s Mem.).

80

IV.  <u>Conclusion</u>

For all the foregoing reasons, I respectfully recommend that judgment on the pleadings be granted in favor of plaintiff and the case be remanded for further proceedings consistent with this report and recommendation.

V.  <u>OBJECTIONS</u>

Pursuant to 28 U.S.C. § 636(b)(1)(c)) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See</u> <u>also</u> Fed. R. Civ. P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Richard M. Berman, United States District Judge, 500 Pearl Street, Room 1320, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Berman.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW.  <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank</u>

v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992); Wesolek v. Canadair

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-238 (2d Cir. 1983).

Dated:   New York, New York
         January 4, 2012

                                      Respectfully submitted,


                                      HENRY PITMAN
                                      United States Magistrate Judge


Copies transmitted to:

Charles E. Binder, Esq.
Binder and Binder P.C.
60 East 42nd Street
Suite 520
New York, New York   10165

Susan C. Branagan, Esq.
Assistant United States Attorney
Southern District of New York
86 Chambers Street
New York, New York   10007